IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| JUDITH SWANSON, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 13-CV-4107-JAR |
| UNUM LIFE INSURANCE COMPANY OF AMERICA d/b/a UNUM GROUP, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Judith Swanson brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), seeking judicial review of Defendant Unum Group's denial of her claim for disability benefits. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 12). For the reasons stated in detail below, the Court grants Defendant's motion.

## I.    Background

The facts of this case are largely uncontroverted. The Court derives the following from the administrative record and the parties' statements of material facts, drawing all reasonable inferences in favor of Plaintiff.

### A.    *The Parties and the Plan*

In 2002, Plaintiff was a full-time intake manager at The Capper Foundation ("Capper"), where she directed Capper's intake process, scheduled therapy sessions, worked out fee arrangements, performed statistical tracking and reporting, and interacted with customers in

person and over the phone.  The job was a sedentary position that involved continuous sitting.

Defendant insured qualifying Capper employees, including Plaintiff, for long-term disability coverage through an ERISA-regulated welfare benefit plan.  Under the plan, "disability" means that because of injury or sickness:

> 1.  the insured cannot perform each of the material duties of his regular occupation; and
>
> 2.  after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education, or experience; or
>
> 3.  the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
>
>> a.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
>>
>> b.  earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

Long-term disability benefits are payable if the insured person (1) submits proof of disability, (2) is under the regular care of a physician, and (3) has completed the ninety-day elimination period. The plan delegates to Defendant discretionary authority to determine an employee's eligibility for benefits and to construe the plan's terms.

### B.     *Plaintiff's Treatment History and Claim for Benefits*

Plaintiff began suffering from intermittent headaches, jaw pain, and sinus issues in the fall of 2005.  She had sinus surgery in 2007 as a result and thereafter began wearing a night brace to alleviate her jaw pain.  By the fall of 2007, however, she had developed constant pain on the left side of her head, face, and ear.  She underwent jaw replacement surgery at the Mayo Clinic in June 2008, which eased her face and ear pain but did not curb her headaches.

2

In August 2008, Plaintiff saw neurologist Jonson Huang for an evaluation of the headaches persisting on her left side.  Dr. Huang conducted a neurological examination and observed that the exam results were normal.  An MRI of Plaintiff's cervical spine and an EMG of her upper and lower extremities proved normal as well.  Dr. Huang concluded that Plaintiff suffered left occipital pain of indeterminate etiology and referred her to another neurologist, Dr. J.D. Bartleson, for a specialty evaluation at the Mayo Clinic.

Dr. Bartleson examined Plaintiff on April 13, 2009.  He found Plaintiff's neurological exam normal, but suspected based on her "continuous left-sided head pain" that she suffered from hemicrania continua, a condition "characterized by unilateral headache and facial pain that is continuous 24/7 with periods of exacerbation that occur with varying frequency."[1]  Dr. Bartleson recommended that Plaintiff take Indomethacin to go along with her current dose of Topamax.  He advised that if those medications did not eliminate her headaches, Plaintiff should try Botox injections and occipital nerve stimulation.

Plaintiff returned to see Dr. Huang eight times over the next two and one-half years. Records of those visits indicate that the Indomethacin Dr. Bartleson prescribed significantly reduced the severity of Plaintiff's headaches but did not eliminate them.  Plaintiff's symptoms and treatment regimen otherwise remained unchanged, with a few notable exceptions.  At her visits in October 2010 and January 2011, Plaintiff reported an onset of lower back and neck pain in addition to her continuing headaches.  She received Botox injections, which did not help.  On June 15, 2011, Plaintiff told Dr. Huang that her headaches had spread to her right side "in the last approximately two to three weeks."  Plaintiff had apparently reduced her Indomethacin

---

[1]Doc. 13-1 at 114.

intake of her own accord several weeks before that appointment, so Dr. Huang returned her Indomethacin intake to its original frequency.  He also prescribed Paxil for stress, as Plaintiff had reported experiencing stress at work.  Then, on July 13, 2011, apparently without seeing Plaintiff for an office visit, Dr. Huang wrote a note recommending that Plaintiff cease working full-time and begin working a maximum of twenty hours per week.  Pursuant to this recommendation, Plaintiff began working a part-time schedule on July 18, 2011.

Plaintiff returned to see Dr. Bartleson on September 9 and 13, 2011.  Dr. Bartleson observed that Plaintiff's blood tests and MRI brain scan were normal and that an MRI of her cervical spine revealed some mild spondylosis.  He noted that Indomethacin had been of "marked but incomplete help" for her left-sided head pain, but remained confident in his initial diagnosis that hemicrania continua was causing her headaches.  But because the Keppra Plaintiff was taking at the time[2] did not seem to be helping, Dr. Bartleson recommended that Plaintiff "rapidly taper and discontinue her use of Keppra" and start taking Depakote instead.  He also gave her a brochure on the Mayo Clinic's Comprehensive Pain Rehabilitation Center program, which he thought might help her function better despite her pain.  After Plaintiff spoke with Dr. Huang about some possible side effects of Depakote, however, Plaintiff declined to take Depakote and elected to continue taking Keppra.  She was also unable to participate in the pain rehabilitation program at the Mayo Clinic "due to lack of financial resources."[3]

Plaintiff filed her claim for long-term disability benefits on October 3, 2011, on the ground that she could not perform all of the material duties of her occupation on a full-time

---

[2]Dr. Huang discontinued Plaintiff's use of Topamax in favor of Keppra on February 4, 2010, after Plaintiff experienced hair loss as a side effect of the Topamax.

[3]Doc. 13-1 at 180.

basis.  Her claim form indicated that she had received treatment for hemicrania continua since 2005 and that as a result of the condition she had begun working only twenty hours per week. Plaintiff wrote that the condition disabled her from looking and sitting at her computer for forty hours per week, maintaining a positive attitude, attending all of her scheduled meetings, being available for customers and therapists as needed, and performing her statistical reporting in a timely manner.  She noted that her next visit with Dr. Huang was scheduled for October 26, 2011.  Dr. Huang, in addition, filled out an attending physician statement ("APS") in support of Plaintiff's claim.  That statement reflected a primary diagnosis of "headaches" and a secondary diagnosis of "low back pain," and indicated that Dr. Huang had advised Plaintiff to stop working on a full-time basis.  Dr. Huang described Plaintiff's "restrictions"[4] as "max of 20 hours per week" and her "limitations"[5] as "may work max of 20 hrs / week."  He also opined that Plaintiff could sit, stand, and walk only occasionally, or 1–33% of the time.  Finally, the APS listed Plaintiff's current medications: Keppra, Fioricet, and Indomethacin.

### C.      *Administrative Review*

Defendant assigned Disability Benefits Specialist Angela Copeland to review Plaintiff's claim.  Ms. Copeland first requested medical records from Drs. Huang and Bartleson pertaining to Plaintiff's treatment since May 1, 2011; those records documented Plaintiff's treatment history at length.  Ms. Copeland then called Plaintiff to discuss her claim.  During that phone conversation, Plaintiff said that the condition had not caused her to miss any work before switching to part-time duties because she had "fought through" the pain.  She also stated that she

---

[4]Unum's claim form defines "restrictions" as "activities the patient should not do."

[5]Unum's claim form defines "limitations" as "activities the patient cannot do."

was unable to do much housework or to maintain a social life before switching to part-time work; after reducing her hours, however, Plaintiff found that she could go home to rest and then "get a little done around the house." Plaintiff reported that her weekly part-time schedule involved five four-hour shifts, Monday through Friday.

Ms. Copeland referred Plaintiff's file to Senior Clinical Consultant Letitia McMullin, RN, for review. Ms. McMullin concluded that the evidence in Plaintiff's file did not support Dr. Huang's opinion that Plaintiff was disabled from working full-time. Ms. McMullin observed, in particular, that Plaintiff was apparently able to function at work and that she had declined to follow Dr. Bartleson's recommendation to switch from Keppra to Depakote, despite the fact that Keppra "is not one of the recommended treatments for hemicrania continua." Ms. McMullin opined that "[t]hese actions would indicate that the insured has chosen to work 20 hours per week." She then noted that she would contact Dr. Huang to discuss Plaintiff's condition and prognosis for returning to full-time work.

Ten days after issuing her opinion, Ms. McMullin wrote a letter to Dr. Huang requesting, among other things, a timetable for Plaintiff's return to full-time work and a description of the barriers that would prevent Plaintiff from performing her duties full-time. Dr. Huang's response stated in relevant part as follows:

> I am writing in response to your letter concerning [Plaintiff]. I have been following [Plaintiff] in regards to left hemicrania continua headaches. [Plaintiff] is unable to work full-time due to the continuous pain related to her headaches. I do not believe she will be able to return to full-time work due to her chronic condition. She has tried numerous medications including abortive and maintenance medications with no improvement in symptoms. She was referred to Mayo Clinic where a treatment plan was developed, which is the current plan of care. There are no vocational goals as she is unable to work full-time; therefore a

transition to full-time employment is not applicable.

Ms. Copeland then referred Plaintiff's file to two Unum physicians for review.  The first, Dr. Richard Maguire, opined that the available medical evidence failed to support Dr. Huang's conclusion that Plaintiff could not perform her occupation on a full-time basis.  Dr. Maguire observed, first, a lack of physical exam findings or other diagnostic test findings to support an inability to do full-time, sedentary work.  The record contained no evidence of structural damage or functional loss associated with Plaintiff's cervical or lumbar spine which would prevent her from sitting at her computer full-time.  All of Plaintiff's medical tests, in fact, returned essentially normal results.  Dr. Maguire thus determined that Dr. Huang's opinion of Plaintiff's functional capacity was based on Plaintiff's self-reported tolerance issues and was not supported by the clinical information available.  In addition, Dr. Maguire stated that the record did not reflect a worsening of Plaintiff's headaches such that a reduction in work hours was necessary.  Though Plaintiff reported that her pain had spread to her right side at least two weeks prior to her June 15 appointment with Dr. Huang, she did not switch to part-time work until July 18.  Further, Plaintiff's treatment regimen during that time period remained substantially the same, despite the changes Dr. Bartleson had recommended.  And, in Dr. Maguire's view, the frequency with which Plaintiff was seeing a physician—about once every three months—was "not supportive of impairment."

The second Unum physician to review Plaintiff's file, Dr. Linda Cowell, agreed with Dr. Maguire's assessment.  Like her colleague, Dr. Cowell found Plaintiff's normal test results particularly noteworthy.  She also opined that the record evidence was inconsistent with a disability beginning in July 2011.  Despite the multiple forms of treatment Plaintiff had

undergone since 2007 and the chronic pain Plaintiff reportedly suffered, she had continued to work forty hours per week for years.  And though Plaintiff reported that the pain spread to her right side in the spring of 2011, no medical evidence suggested that this change resulted in more severe pain or a loss of functional capacity to perform her occupational duties full-time.  Dr. Huang's notes for Plaintiff's June 2011 appointment, Dr. Cowell pointed out, do not mention a need for Plaintiff to change her duties or reduce her hours due to chronic pain.  Dr. Cowell thus concluded that the medical evidence did not support a finding of disability.

On January 11, 2012, Defendant wrote Plaintiff a detailed letter notifying her of its decision to deny her benefits claim.  Defendant related the assessments of its onsite physicians, including their shared opinion that the record lacked any clinical evidence of Plaintiff's disability to perform her "primarily seated occupation" on a full-time basis.  The letter explained that Dr. Huang's opinion on Plaintiff's functional capacity was based on Plaintiff's self-reported inability to tolerate her pain, but was not supported by the clinical information available.  Defendant also stated that Plaintiff's condition did not appear to have worsened to a degree that required a reduction in work hours.  The letter noted, among other things, that (1) Plaintiff had continued working full-time since she started seeing Dr. Huang in 2008; (2) though Plaintiff's headaches spread to her right side at the beginning of June 2011, her work hours were not reduced until July 18, 2011; (3) Plaintiff's treatment regimen did not materially change since her headaches spread to her right side; (4) Plaintiff was seeing a physician only once every three months; and (5) Plaintiff did not follow Dr. Bartleson's recommendation to stop taking Keppra and to start taking Depakote instead.

Plaintiff appealed the decision.  On appeal, she submitted several additional medical

records, consisting primarily of notes from office visits to Drs. Huang and Bartleson from

August 2008 to May 2011.  She also submitted another letter from Dr. Huang reiterating his

opinion on Plaintiff's ability to work:

> [Plaintiff] is unable to work full-time due to the continuous pain
> related to her headaches.  I do not believe she will be able to return
> to full-time work due to her chronic condition.  She has been
> referred to numerous specialist [sic] and physicians, which include
> Mayo Clinic.  She has been compliant with all treatment and
> recommendations given to her.  She is able to work part-time or
> approximately 20 hours per week.  It is my recommendation she be
> approved for long-term disability.[6]

Defendant then referred Plaintiff's file to a third Unum physician, Dr. Beth Schnars.

After reviewing the records, Dr. Schnars opined that the clinical evidence available did not show

that Plaintiff was unable to perform her duties full-time.  Dr. Schnars noted that all of Plaintiff's

physical tests and neurological examinations had remained normal since her first visit with Dr.

Huang in August 2008.  She also stated that Dr. Huang's office visit notes from the period prior

to Plaintiff's switch to part-time work did not indicate an increase in the frequency or severity of

her headaches, reflect a change in medication or other treatment, or document any concern with

Plaintiff maintaining a full-time work schedule.  And, she found the three-month gap between

Plaintiff's June 2011 office visit and her September 2011 office visit to be inconsistent with a

finding of disability beginning in July 2011.

After reviewing Dr. Schnars' analysis, Defendant sent a letter to Plaintiff denying her

appeal on essentially the same grounds as those identified in its initial denial letter.  Defendant

informed Plaintiff that she had exhausted all administrative remedies available under the plan

---

[6]Doc. 13-1 at 211.

and that she had a right to bring a civil suit under ERISA.  Plaintiff now seeks review in this Court, claiming Defendant's denial of long-term disability benefits was arbitrary and capricious.

## II.    Standards of Review

### A.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[7]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[8]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[9]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[10]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[11]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[12]  "A movant that will not bear the burden of persuasion at trial need not negate the

---

[7]Fed. R. Civ. P. 56(a).

[8]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[9]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[10]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[11]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[12]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

nonmovant's claim."[13]  The burden may be met by showing that there is no evidence to support

the nonmoving party's case.[14]  If this initial burden is met, the nonmovant must then "go beyond

the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant."[15]  When the moving party

also bears the burden of proof at trial,

> a more stringent summary judgment standard applies. Thus, if the
> moving party bears the burden of proof, to obtain summary
> judgment, it cannot force the nonmoving party to come forward
> with "specific facts showing there [is] a genuine issue for trial"
> merely by pointing to parts of the record that it believes illustrate
> the absence of a genuine issue of material fact. Instead, the moving
> party must establish, as a matter of law, all essential elements of
> the issue before the nonmoving party can be obligated to bring
> forward any specific facts alleged to rebut the movant's case.[16]

To accomplish this, the facts "must be identified by reference to an affidavit, a deposition

transcript, or a specific exhibit incorporated therein."[17]  Rule 56(c)(4) provides that opposing

affidavits must be made on personal knowledge and shall set forth such facts as would be

admissible in evidence.[18]  The non-moving party cannot avoid summary judgment by repeating

conclusory opinions, allegations unsupported by specific facts, or speculation.[19]

---

[13]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[14]*Id.*

[15]*Id.*

[16]*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[17]*Adams*, 233 F.3d at 1246.

[18]Fed. R. Civ. P. 56(c)(4).

[19]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[20]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[21]

### B.       *Review of Adverse Benefits Determination*

In the ERISA context, district court review "is limited to the administrative record, i.e., the materials compiled by the ERISA plan's administrator in the course of making its decision."[22]  This case is governed by the standards applicable to an appeal of an administrative decision, and "the court acts as an appellate court and evaluates the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record."[23]

An adverse benefits determination under ERISA "is to be reviewed under a *do novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[24]  Where, as here, the plan explicitly gives the administrator this discretionary authority, courts "employ a deferential

---

[20]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[21]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[22]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quoting *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) (citation and internal quotation marks omitted)).

[23]*Panther v. Synthes (U.S.A.)*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005) (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 & n.31 (10th Cir. 1994)).

[24]*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

standard of review, asking only whether the denial of benefits was arbitrary and capricious."[25]

Under this standard, "review is limited to determining whether the interpretation of the plan was

reasonable and made in good faith."[26]  The plan administrator's decision will be upheld "so long

as it is predicated on a reasoned basis."[27]  "[T]here is no requirement that the basis relied upon be

the only logical one or even the superlative one."[28]  Rather, courts ask only "whether the

administrator's decision resides somewhere on a continuum of reasonableness—even if on the

low end."[29]  "Consequently, the Tenth Circuit has observed that the arbitrary and capricious

standard is a difficult one for a claimant to overcome."[30]

The parties agree that the arbitrary-and-capricious standard applies to the benefits

determination at issue in this case.[31]  However, in *Metropolitan Life Insurance Co. v. Glenn*,[32]

---

[25]*Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quotations omitted).

[26]*Id.* at 1134.

[27]*Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

[28]*Id.*

[29]*Id.* (internal quotation marks and citations omitted).

[30]*Berges*, 704 F. Supp. 2d at 1174 (quoting *Nance v. Sun Life Assurance Co. of. Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002)).

[31]Plaintiff suggests in her statement of material facts that Defendant failed to comply with 29 C.F.R. § 2560.503–1(f)(3), which allows Defendant to extend its deadline for making a benefits determination only if the extension is "due to matters beyond the control of the plan." Plaintiff states that Defendant extended its deadline for a decision in this case due to circumstances *within* its control; specifically, Plaintiff contends Defendant could have paid for and received Plaintiff's medical records earlier, so that an extension for the benefits decision would not be necessary.  A substantial violation of § 2560.503–1(f)(3) would normally entitle Plaintiff to *de novo* review.  *See Rasenack ex.rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316–18 (10th Cir. 2009).  But Plaintiff does not argue that she is entitled to *de novo* review.  Perhaps this is because Defendant, if it violated the regulation, was at least in substantial compliance with it; indeed, Defendant extended its decision deadline while engaging in an "ongoing productive evidence-gathering process," and kept Plaintiff "reasonably well-informed as to the status of [her] claim" throughout the review.  *See id.*  In any event, Plaintiff actively participated in Defendant's claims review process until a decision was rendered, forgoing her opportunity to proceed to court upon the asserted violation of § 2560.503–1(f)(3).  *See Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 984 (9th Cir. 2005) (applying the deferential standard of review under similar circumstances).  Because Plaintiff does not contend that

the Supreme Court held that when an ERISA fiduciary is responsible for making benefits

determinations and is also the party responsible for paying claims, an inherent, dual-role conflict

of interest exists.[33]  The presence of such a conflict does not alter the standard of review, but

courts consider the conflict as a factor in determining whether the plan administrator has abused

its discretion in denying benefits.[34]  The significance of the factor will depend on the

circumstances of the particular case.[35]  *Glenn* stated that:

> [t]he conflict of interest . . . should prove more important (perhaps
> of great importance) where circumstances suggest a higher
> likelihood that it affected the benefits decision, including, but not
> limited to, cases where an insurance company administrator has a
> history of biased claims administration. . . . It should prove less
> important (perhaps to the vanishing point) where the administrator
> has taken active steps to reduce potential bias and to promote
> accuracy, for example, by walling off claims administrators from
> those interested in firm finances, or by imposing management
> checks that penalize inaccurate decisionmaking irrespective of
> whom the inaccuracy benefits.[36]

The parties do not dispute that Defendant acted as both insurer and administrator of the

plan at issue here.  Plaintiff contends the Court should attribute "great importance" to the

resulting conflict,[37] as courts have found Defendant to have a history of biased claims

---

she is entitled to *de novo* review as a result of the deadline extension, the Court will apply the arbitrary-and-
capricious standard.

[32]554 U.S. 105 (2008).

[33]*Id.* at 114.

[34]*Id.* at 105.

[35]*Id.*

[36]*Id.* at 117 (citations omitted).

[37]*See id.*

administration.[38]  As Defendant points out, however, judicial criticism of Defendant's history relates primarily to the claims practices it employed during the decade ending in 2003.[39]  Courts have recognized that Defendant has since changed its internal procedures and that its previous pattern of misconduct is "no longer present."[40]  Thus, numerous recent cases addressing the issue have found Defendant's claims administration history to be, at most, a minor factor in reviewing a decision by Defendant to deny benefits.[41]  Because Defendant issued its benefits determination in this case nearly a decade after its documented history of abusive practices,[42] and in light of case law finding that its claims practices have improved since 2003,[43] the Court places limited weight on Defendant's history.

Plaintiff also asserts that Defendant's administrative review was an "insular process" involving "serious irregularities which cast doubt on the integrity of its claims procedures."[44]

---

[38]*See id.* (citing John H. Langbein, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA*, 101 Nw. U. L. Rev. 1315, 1317–21 (2007) (criticizing Unum Group for its history of biased claims administration)); *Stephan v. Unum Life Ins. Co. of. Am.*, 697 F.3d 917, 933–34 (9th Cir. 2012) (collecting cases that have commended on Unum's history of erroneous and arbitrary benefits denials).

[39]*Jones v. Unum Provident Corp.*, 596 F.3d 433, 438 (8th Cir. 2010) (citing *Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 776 (8th Cir. 2009); *Wakkinen v. Unum Life Ins. Co. of Am.*, 531 F.3d 575, 582 (8th Cir. 2008)).

[40]*See, e.g.*, *Mercado v. First Unum Life Ins. Co.*, No. 11 Civ. 4272, 2013 WL 633100, at *27 (S.D.N.Y. Feb. 21, 2013) (citation omitted).

[41]*See e.g.*, *Jones*, 596 F.3d at 438; *Rozek v. N.Y. Blood Ctr.*, 925 F. Supp. 2d 315, 341 (E.D.N.Y. 2013); *Mercado*, 2013 WL 633100, at *27; *Taylor v. Unum Life Ins. Co. of Am.*, No. 11-CV-2602, U.S. Dist. LEXIS 7437, at *10 n.2 (N.D. Tex. Feb. 20, 2013); *Burton v. Unum Life Ins. Co. of Am.*, No. A-09-CA-532-SS, 2010 WL 2430767, at *11 (W.D. Tex. June 14, 2010); *Uquillas v. Unum Life Ins. Co. of Am.*, No. CV 07-00542, 2010 WL 330255, at *17 (C.D. Cal. Jan. 21, 2010).

[42]*See Jones*, 596 F.3d at 438 (finding Unum's dual-role conflict to be of limited weight where the benefits determination was issued in 2005, two years after "the decade ending in 2003").

[43]*See Mercado*, 2013 WL 633100, at *27.

[44]Doc. 24 at 2.

But apart from her conclusory allegations of "inadequate information gathering" and "documentary selective perception," Plaintiff does not identify which of Defendant's procedures raise doubt concerning the integrity of its review. The Court is reluctant to hazard guesses about which facts Plaintiff might have cited in support of her position. To the extent Plaintiff faults Defendant for "inadequate information gathering," however, the Court briefly notes that it is Plaintiff's burden to submit adequate proof of disability,[45] and the plan requires her to provide that proof at her own expense.[46] In addition, to the extent Plaintiff believes Defendant's use of "in-house" physicians resulted in an "insular" review process, the Court observes that Defendant notified Plaintiff of her right to an " 'independent medical examination' (IME) should opinions differ on the degree of medical impairment."[47] Plaintiff apparently chose not to request an independent examination during the review of her claim; but in light of her opportunity to do so, the Court will not place great weight on Defendant's decision to rely on the medical analyses of its own onsite professionals. Finally, nothing in the record suggests that approval of Plaintiff's claim would have had a significant economic impact on Defendant.[48] The circumstances of the case, therefore, do not suggest that Defendant's conflict of interest impacted its benefits determination. The Court finds that the conflict carries limited weight here.

**III.    Discussion**

        After reviewing the records Plaintiff submitted in support of her claim for disability

---

[45]*See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

[46]Doc. 13-1 at 50, 59.

[47]Doc. 13-1 at 74.

[48]*See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999).

benefits, Defendant denied the claim based on (1) an asserted lack of diagnostic test findings, physical exam findings, or any other clinical evidence suggesting that Plaintiff was unable to perform all the material duties of her occupation on a full-time basis, and (2) circumstantial evidence which Defendant interpreted to suggest that Plaintiff was currently able to perform her duties full-time, just as she had for several years prior to her date of reported disability.  Plaintiff contends the denial of benefits was unreasonable in light of Dr. Huang's opinion that Plaintiff could not perform her duties on a full-time schedule.  Defendant responds that because Dr. Huang's recommendation to begin part-time work was based wholly on Plaintiff's subjective reports of pain, it was not unreasonable for Defendant to require "objective evidence" to substantiate her disability.  Absent such evidence, Defendant continues, its interpretation of the available circumstantial evidence was a reasonable one.  The Court will review each basis for denial separately.

### A.      *Lack of Objective Evidence*

The record in this case indicates that hemicrania continua is "characterized by unilateral headache and facial pain."[49]  The condition thus appears to share a feature with diseases like chronic fatigue syndrome and fibromyalgia, in that its symptoms are entirely subjective: headaches do not show up on laboratory tests, and physical examinations cannot confirm their existence.[50]  Such conditions have presented difficulties for insurers and courts evaluating

---

[49] Doc. 13-1 at 114.

[50] *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003) (noting that the symptoms of fibromyalgia and chronic fatigue syndrome are subjective).

disability claims.[51]  On the one hand, if disability could be rejected on the ground that a

condition cannot be proven through objective tests, claimants with certain disabling conditions

would find it impossible to prove disability.[52]  Courts have therefore found it arbitrary and

capricious for plan administrators to require "objective medical evidence" of a diagnosis for

which no such evidence exists.[53]  On the other hand, treating physicians typically accept at face

value what patients tell them about their subjective symptoms;[54] if plan administrators did not

require some form of objective evidence in those cases, claimants' assertions of disability based

on pain or fatigue would prove unchallengeable.[55]  For this reason, courts have held that plan

administrators may reasonably require objective evidence of the occupational limitations caused

by a claimant's condition, even if the condition itself cannot be diagnosed through objective

means.[56]  A general rule has thus emerged: while a plan administrator may not reasonably

demand objective medical evidence of a condition which is incapable of objective diagnosis, it

---

[51]*Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) (quoting *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)) (internal quotation marks omitted).

[52]*See Meraou v. Williams Co. Long Term Disability Plan*, 221 Fed. App'x 696, 705 (10th Cir. 2007).

[53]*See, e.g.*, *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011); *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 21–22 (1st Cir. 2003); *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1112 (9th Cir. 1999); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442–43 (3d Cir. 1997).

[54]*Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004).

[55]*See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 878 (9th Cir. 2004) ("With a condition such as fibromyalgia, where the applicant's physicians depend entirely on the patient's pain reports for their diagnoses, their *ipse dixit* cannot be unchallengeable."), *abrogated on other grounds* by *Salomaa*, 642 F.3d at 673–74; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[W]e hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.").

[56]*See, e.g.*, *Loughray v. Hartford Group Life Ins. Co.*, 366 F. App'x 913, 926–27 (10th Cir 2010); *Meraou*, 221 F. App'x at 705–06; *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006); *Jordan*, 370 F.3d at 878; *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16–17 (1st Cir. 2003); *Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1205–06 (N.D. Ga. 2005); *Karvelis v. Reliance Standard Life Ins. Co.*, No. Civ.A. H-03-3848, 2005 WL 1801943, at *15 (S.D. Tex. July 28, 2005).

may reasonably require objective evidence that a claimant's diagnosed condition renders her

unable to perform her occupational duties.[57]

Though the Tenth Circuit has not adopted this rule in a published decision, it has held in

unpublished decisions that plan administrators may require objective evidence of a claimant's

occupational limitations.[58]  The Court finds this rule persuasive.  As the court in the Northern

District of Georgia has observed:

> The requirement that a plaintiff submit objective evidence of the
> impact of a diagnosed disease, illness or other condition is logical
> and necessary, especially in the case of diagnoses such as [chronic
> fatigue syndrome].  The objective-evidence requirement promotes
> integrity in the application of the law.  It assures claimants are
> treated fairly and with parity by providing that coverage decisions
> are not based on varying subjective expressions by claimants of a
> disease, illness or condition with which they have been diagnosed.
> That is, it requires claimants to establish that the diagnosed
> disease, illness or condition results in an actual disability, not just a
> perceived one.  The requirement of objective evidence also
> promotes integrity by assuring there is corroboration for a
> claimant's subjective complaints, thus deterring embellished
> allegations of the effect of the diagnosed malady as well as
> deterring fraud in the claims process.[59]

This "objective evidence requirement," moreover, does not require claimants to submit evidence

that does not exist.  Courts have found that objective evidence of occupational limitations may

---

[57]*See, e.g.*, *Jordan*, 370 F.3d at 878; *Boardman*, 337 F.3d at 16–17; *Nichols v. Verizon Commc'ns, Inc.*, 78 F. App'x 209, 212 (3d Cir. 2003); *Brucks*, 391 F. Supp. 2d at 1205–06 (citing *Karvelis*, 2005 WL 1801943, at *15). *But see Hawkins*, 326 F.3d at 918 (finding, in a "close case," that though fibromyalgia "can be diagnosed more or less objectively by the 18-point test," it was unreasonable for the plan to require objective evidence of the severity of the claimant's pain in order to substantiate his disability).

[58]*See Loughray*, 366 F. App'x at 926–27 ("As Loughray lacked any objective medical proof that her [chronic fatigue syndrome] impaired her ability to perform her work as a sales commissioned employee, Hartford was not unreasonable in concluding she did not suffer from *disabling* chronic fatigue." (emphasis added)); *Meraou*, 221 F. App'x at 705–06 ("Denial of benefits is permissible when the allegedly disabling condition has been established only by the claimant's subjective complaints, and the claimant has failed to supply requested information that would allow the administrator to determine the ongoing effect of the condition.").

[59]*Brucks*, 391 F. Supp. 2d at 1205.

be provided through tests of claimants' physical strength, stamina, or mental ability.[60]

Psychiatric evaluations, for example, may show whether claimants struggle to concentrate or

interact with others in a positive manner.[61]  And courts routinely rely on the results of

"functional capacity evaluations" to test a claimant's actual ability to perform physical tasks

such as sitting, standing, walking, lifting, and reaching.[62]  Because those tests turn not on

claimants' reporting of subjective symptoms, but rather on demonstrated ability to perform

work-related tasks, they constitute objective evidence of disability.[63]  Defendant was entitled to

require such, or similar, objective evidence in this case.

      After its initial review, Defendant advised Plaintiff that she had failed to demonstrate by

objective evidence that her headaches and back pain rendered her unable to perform her duties

on a full-time basis.  Defendant's denial letter explained that the record contained no physical

exam findings, diagnostic test findings, or other clinical evidence suggesting that she could not

work a full-time schedule.[64]  Defendant also informed Plaintiff of her right to submit additional

---

[60]*See, e.g.*, *Meraou*, 221 Fed. Appx at 704 (finding the plan administrator reasonable to require the claimant to submit "behavioral observations or objective data" substantiating the impact of her diagnosed conditions on her ability to work); *Karvelis*, 2005 WL 1801943, at *18 (noting that the claimant's treating physician might have administered "objective tests of physical strength or stamina, or objective tests of memory and ability to concentrate"); *Brucks*, 391 F. Supp. 2d at 1199, 1204 (finding a plan administrator reasonable to require objective clinical findings on the claimant's ability to work, including, for example, a functional capacity evaluation).

[61]*See Karvelis*, 2005 WL 1801943, at *19 (finding that a psychiatric evaluation provided objective evidence of a claimant's ability to "concentrate, remember, and interact with coworkers and subordinates"); *see also Salomaa*, 642 F.3d at 682 (Hall, J., dissenting) (finding that the decreased intelligence quotient documented during the claimant's neuropsychological exam demonstrated that "objective tests *can* be used to prove disability from CFS").

[62]*See, e.g.*, *Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260, 262, 264–65 (11th Cir. 2007); *Karvelis*, 2005 WL 1801943, at *19; *Hotaling v. Teachers Ins. & Annuity Ass'n of Am.*, 62 F. Supp. 2d 731, 734–35, (N.D.N.Y. 1999).

[63]*See Hotaling*, 62 F. Supp. 2d at 739–40.

[64]*See* Doc. 13-1 at 164–65.

evidence and documentation if she decided to appeal.[65]  On appeal, however, Plaintiff did not

submit any new evidence supporting her asserted functional limitations.  Instead, she submitted

additional office visit notes which provided no new information about her ability to work, and

another letter from Dr. Huang reiterating his opinion that Plaintiff's headaches are

disabling[66]—an opinion which Defendant had already found unsupported by any objective

clinical evidence.

Plaintiff contends that Defendant unreasonably ignored the assessment Dr. Huang

provided in his APS, opining that Plaintiff's pain allows her to sit only "occasionally," or 1–33%

of the time.[67]  Because her position requires "continuous" sitting, Plaintiff argues, Dr. Huang's

assessment demonstrates that Plaintiff cannot perform all of her duties for a full eight-hour

workday.  But Defendant did not *ignore* Dr. Huang's assessment.  Rather, Defendant concluded

that the assessment appears to be based wholly on Plaintiff's subjective descriptions of her pain

and limitations and, thus, does not constitute *objective* evidence of her inability to sit full-time.[68]

Indeed, Plaintiff did not contest on administrative appeal, and does not assert before this Court,

that Dr. Huang relied on a physical examination or some other objective test to support his

conclusion that Plaintiff can sit only occasionally.[69]  This case thus appears similar to *Pralutsky*

---

[65]*See id.* at 166.

[66]*See id.* at 211.

[67]*See id.* at 29.

[68]*See id.* at 165.

[69]*See Karvelis*, 2005 WL 1801943, at *19 (finding that a treating physician's opinion of a claimant's functional limitations was not objective evidence of disability where the physician relied only on the claimant's subjective descriptions of her conditions and limitations).

*v. Metropolitan Life Insurance Co.*,[70] *Testa v. Hartford Life Insurance Co.*,[71] and *Wangstein v. Equifax, Inc.*,[72] in which various circuits upheld benefits denials for failure to submit objective evidence, in part because the functional limitations asserted by claimants' treating physicians were based solely on the claimants' subjective reporting of symptoms.[73]

The Court agrees with Defendant that the record in this case contains no objective evidence of Plaintiff's asserted occupational limitations. Under similar circumstances, courts have founds benefits denials proper even under the *de novo* standard of review.[74] In light of Defendant's demand for objective evidence to substantiate Plaintiff's disability, therefore, Defendant was not unreasonable to find that Plaintiff failed to demonstrate an inability to perform her sedentary and "primarily seated occupation" on a full-time basis.[75]

### B.     Circumstantial Evidence

Defendant found, in addition, that the circumstances surrounding Plaintiff's switch to a part-time schedule suggested she was still able to perform her duties full-time. In particular, Defendant concluded that Plaintiff's pain had not worsened to a degree warranting her July 2011 switch to part-time work. Though Plaintiff had reported an onset of low back pain and right-

---

[70]435 F.3d 833 (8th Cir. 2006).

[71]483 F. App'x 595 (2d Cir. 2012).

[72]191 F. App'x 905 (11th Cir. 2006).

[73]*See Testa*, 483 F. App'x at 598 (affirming *Testa v. Harford Life Ins. Co.*, No. 08–CV–816, 2011 WL 795055, at *2 (E.D.N.Y. March 1, 2011), in which the claimant's treating physician opined that the claimant was unable to sit or stand for more than one hour at a time); *Wangstein*, 191 F. App'x at 908, 912; *Pralutsky*, 435 F.3d at 835–36, 839–40.

[74]*See, e.g.*, *Wangstein*, 191 F. App'x at 911–13; *Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1205 (N.D. Ga. 2005).

[75]*See* Doc. 13-1 at 164.

sided head pain in the months leading up to her June 2011 office visit with Dr. Huang, notes from that visit do not document a decrease in functional capacity or a concern with Plaintiff's continuing to work full-time.  Nor did Plaintiff's treatment regimen ever change.  Even after Plaintiff switched to part-time work, in fact, she refused to follow Dr. Bartleson's recommendation to start taking Depakote, which he thought might prove helpful for her pain. She also continued to see a physician only once every three months—a frequency which Defendant's physicians found "not supportive of impairment."[76]  Defendant, therefore, found that Plaintiff could maintain the full-time schedule she had worked for several years despite her headaches.

Plaintiff argues that Defendant's interpretation of the above circumstances was unreasonable.  She points out that she declined to take Depakote only after speaking with Dr. Huang about the medication's possible side effects, including "hair loss, tremor, impairment of mentation, [and] weight gain."[77]  Plaintiff also argues that the stability of her treatment regime and the frequency of her visits to Dr. Huang are not inconsistent with a finding of disability. According to Plaintiff, because she has "largely exhausted trial treatment alternatives that would not expose her to an unacceptable risk of serious side-effects, she and Dr. Huang are attempting to manage her symptoms so that she does not experience any further declines."[78]  Since her current medications and her office visits every three months allow Plaintiff to maintain her current level of functionality, she urges that Defendant was unreasonable to rely on the

---

[76]*Id.* at 165.

[77]*Id.* at 215.

[78]Doc. 27 at 47.

inferences its physicians drew from Plaintiff's treatment history.

In light of the lack of objective evidence supporting Plaintiff's claim, the Court finds Defendant's interpretation of the circumstantial evidence available in this case to be reasonable. This evidence, to be sure, is not overwhelming.  But Defendant was entitled to look for *some* objective indication that Plaintiff could no longer work a full-time schedule.[79]  Defendant therefore considered whether Plaintiff's actions and course of treatment suggested that she was disabled.  In so doing, Defendant was reasonable to rely on the *medical* experience of its three reviewing physicians, who found the constancy of Plaintiff's treatment regimen and the continued infrequency with which she was seeing Dr. Huang to be inconsistent with a finding of disability.  That Dr. Huang disagreed with Defendant's physicians on this point does not make Defendant's decision arbitrary or capricious, as Defendant was not bound to accord Dr. Huang's opinion special weight.[80]  Defendant was also reasonable to take into account Plaintiff's refusal to follow Dr. Bartleson's recommendation to switch from Keppra to Depakote.  Though Plaintiff may have wished to avoid certain possible side effects of Depakote, her reluctance to start even a trial of the recommended medication gave Defendant some reason to doubt that Plaintiff's pain was truly disabling.[81]  And, as Defendant's physicians observed, notes from Plaintiff's June 2011

---

[79]*See, e.g.*, *Loughray v. Hartford Group Life Ins. Co.*, 366 F. App'x 913, 926–27 (10th Cir 2010) (upholding a benefits denial because the claimant did not provide objective medical proof that her chronic fatigue syndrome impaired her ability to perform her work).

[80]*See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[W]e hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.").

[81]*See Breen v. CNA Ins. Cos.*, No. 04-72463, 2005 WL 2562961, at *6 n.3 (E.D. Mich. Oct. 12, 2005) ("Breen's failure to follow her physicians' recommendations for treatment lends support to CNA's decision to terminate her disability benefits."); *Johnson v. Long Term Disability Plan*, No. 03-C-6786, 2004 WL 2318901, at *10 (N.D. Ill. Oct. 8, 2004) (upholding a benefits denial under the arbitrary and capricious standard in part because the claimant failed to follow his specialists' treatment recommendations); *see also Smith v. Pension Comm. Of Johnson & Johnson*, 470 F. App'x 864, 867 (11th Cir. 2012) (finding that a plan administrator was reasonable to request a comprehensive reevaluation of a claimant's condition once the claimant's physician gave notice that the

office visit with Dr. Huang do not document any concern with Plaintiff maintaining a full-time work schedule, even though the reported worsening of symptoms that led to Plaintiff's reduction in hours occurred at least two weeks before that appointment.

Plaintiff argues that whether her symptoms worsened in the months leading up to her switch to part-time work is immaterial.  She suggests, instead, that she met the definition of disability even before she switched to part-time work, but "fought through" the pain for some time in order to maintain her full-time schedule.  She contends she should not be punished for working despite her disability.  In support of this position, Plaintiff cites a Seventh Circuit opinion finding it arbitrary and capricious for a plan administrator to draw an adverse inference from a claimant's decision to work through his reportedly disabling pain.[82]  The Fifth Circuit, however, has disagreed, finding that a claimant's decision to work for years despite her pain "permits the inference that she was able to perform the material and substantial duties of her job while experiencing the level of neck and back pain she experienced" prior to the date she stopped working.[83]

The Court finds that on the facts of this case, Defendant was reasonable to consider Plaintiff's history of full-time work and, thus, the degree to which her symptoms worsened prior to switching to a part-time schedule.  As already explained, Defendant was permitted to demand evidence of disability which did not stem from Plaintiff's subjective reporting of pain symptoms. Defendant was not unreasonable, therefore, to consider every piece of objective evidence

---

claimant failed to comply with treatment recommendations).

[82]*See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) (stating that there is "no logical incompatibility between working full-time and being disabled from working full-time").

[83]*Mouton v. Fresenius Med. Care of N.A.*, 77 F. App'x 712, 714 (5th Cir. 2003).

available, including the fact that Plaintiff had worked full-time for several years despite her reported pain.  Considered with the other pieces of circumstantial evidence already discussed, and in light of the complete dearth of objective evidence in the record supporting Plaintiff's asserted occupational limitations, the record supplied a "reasoned basis" for Defendant's benefits determination.[84]  The Court upholds the decision by Defendant to deny benefits in this case.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 12) is granted.

Dated: January 26, 2015

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[84]*See Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

26